Thomas Stavola, Jr., Esq.; NJ Bar ID number: 380012022
Law Office of Thomas Stavola Jr. LLC
209 County Road 537, Colts Neck, NJ 07722
E: tstavolajr@stavolalaw.com  P: 732-790-0639
*Counsel for Plaintiff – Frederick K. Short Jr.*

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FREDERICK K. SHORT JR., | |
| Plaintiff, | |
| | Case No. |
| v. | |
| | Judge |
| NEW JERSEY DEPARTMENT OF EDUCATION, 100 River View Plaza, PO Box 500, Trenton, NJ 08625-0500; ANGELICA ALLEN-MCMILLAN, Commissioner - New Jersey Department Of Education, acting in her official capacity, 100 River View Plaza, PO Box 500, Trenton, NJ 08625-0500; CHERRY HILL BOARD OF EDUCATION, 45 Ranoldo Terrace, Cherry Hill, NJ 08034; CHERRY HILL SCHOOL DISTRICT, 45 Ranoldo Terrace, Cherry Hill, NJ 08034-0391 | |
| Defendant(s). | |

**Complaint For Declaratory and Injunctive Relief**

Plaintiff FREDERICK K. SHORT JR. ("Plaintiff") by its attorney files this Complaint against the New Jersey Department of Education and Angelica Allen-McMillan, Commissioner of the New Jersey Department Of Education, acting in her official capacity, Cherry Hill Board Of Education, and, Cherry Hill School District, and alleges as follows:

## NATURE OF THE ACTION

1. This is an action to set aside and declare as unconstitutional the New Jersey Transgender Student Guidance for School Districts (hereinafter, "Guidance"), established by the Commissioner of the New Jersey Department of Education ("DOE").

2. The NJ DOE developed and issued guidance, in the form of a model policy, which provides direction for school districts concerning transgender or transitioning students.

3. This model policy/guidance was adopted by countless school districts throughout NJ, including the Cherry Hill Township Public School District.[1]

4. This Guidance, as developed and issued through final agency action of the NJ DOE, and thereupon adopted in its entirety by the Cherry Hill Township Board of Education ("BOE"), is

---

[1] Exhibit E – Cherry Hill Public School District Policy regarding transgender students.

violative of Plaintiff's Fourteenth Amendment substantive due process fundamental rights to direct the care, upbringing and healthcare/medical decisions of his children. The policy stipulates that schools shall keep confidential, and may not disclose, information that may reveal a student's transgender status except as allowed by law. Schools have no affirmative duty to notify a student's parent or guardian of the student's gender identity or expression. Moreover, because the issue of gender identity is inextricably connected to human psychology, it is therefore properly characterized as a healthcare issue, which ostensibly falls within the ambit of parental authority. Parents possess a fundamental right to direct the healthcare/medical decisions of their children.

5.    The NJ Guidance document should further be stricken as ultra vires, as it extends beyond the authority conferred by its enabling statute, N.J.S.A. 18A:36-41. The governing statutory framework and its attendant legislative intent never contemplated the removal of parents from the conversation regarding transitioning or transgender students. The Guidance document impermissibly adds language in its model policy that unconstitutionally impinges upon parental rights and by extension the parent-child relationship.

6.    Plaintiff Short has been, is, and will continue to be harmed by the imposition of the NJ Guidance in the Cherry Hill

Township School District. He has three children in the school district. Plaintiff Short and his three children are forced to participate in, and are subject to, the unconstitutional policy imposed by the Cherry Hill BOE. Plaintiff is deliberately excluded from the conversation about gender identity.

7.    Students are invited on a continuing basis to have confidential discussions with school district personnel on the subject of gender, chosen name, pronouns, and students' preferences regarding parental communications. Plaintiff's children can, at any time, adopt new gender identity preferences and begin living double lives, without Plaintiff' notification or consent. This constitutes a continual interference with Plaintiff's constitutionally protected rights. At any time, Plaintiff's child or children can adopt a new gender identity, without his knowledge or consent. Such secrecy will terminate only if Plaintiff's child decides to disclose to his/her status to Plaintiff or if the child otherwise tells the school to reveal such information to Plaintiff.

8.    Gender identity is an issue which rightly belongs within the purview of parents. Not only is it associated with the parental right to the care and upbringing of children, gender identity decisions are, at their core, healthcare decisions that necessitate the involvement of parent(s).

9.    Therefore, the Cherry Hill BOE's policy, and the NJ DOE's

Guidance, should be stricken and set aside as unconstitutional and ultra vires. Plaintiff's Fourteenth amendment substantive due process fundamental right to make healthcare decisions for his children, and the fundamental right to the care, custody and upbringing of his children, has been contravened by this policy.

10.  And finally, it is important to note that no allegations in this action shall be construed as opposing a person's desire or expression to change their gender identity. The contentions of this action principally concern Plaintiff's parental rights to direct the medical/healthcare decisions of his children, and his rights to the care and upbringing of his children. The collective goal among all stakeholders is the best interest of the child. And in fact, Plaintiff's position in this action furthers that best interest. The NJ Guidance and Cherry Hill Policy, which provide for secrecy and the facilitation of double-lives, are psychologically unhealthy for youth. Conversely, Plaintiff's position - which seeks to involve parents in this integral discussion - facilitates the proper care and response such that the child can maintain optimal psychological health.

## JURISDICTION AND VENUE

11.  This is an action for declaratory and injunctive relief. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 2201

(declaratory judgment), 42 U.S. Code § 1983 (civil action for deprivation of rights). This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claim because it is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."[2]

12. Final agency decisions are subject to judicial review. Plaintiff has met all applicable statute of limitations, namely, the six-year statute of limitations.

13. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this jurisdiction.

## PARTIES

14. Plaintiff Frederick K. Short Jr. resides in Camden County, NJ with his wife and their three children who attend the Cherry Hill Township Public School District. These children are all in high school (freshman and juniors) at Cherry Hill High School West, within the Cherry Hill Township School District. The three children are minors and unemancipated under New Jersey law. Emancipation in NJ is generally defined as no longer within the sphere of influence of the parents, as evidenced by a child who no

---

[2] 28 U.S.C. § 1367(a).

longer lives with or financially depends upon his/her parents. Plaintiff's three children are unemancipated.

15.  Defendants are the New Jersey Department of Education, Angelica Allen-Mcmillan, Commissioner of the New Jersey Department Of Education, acting in her official capacity, Cherry Hill Board Of Education, and Cherry Hill School District.

16.  Defendant NJ DOE, through Commissioner of the NJ DOE Angelica Allen-Mcmillan, issued Guidance that directs school districts regarding transitioning and transgender students. This Guidance document is both violative of the Fourteenth Amendment substantive due process clause and ultra vires as it extends beyond the authority conferred by the enabling statute.

17.  Defendant Cherry Hill Board of Education, adopted the constitutionally violative NJ Guidance model policy at issue in this action.

18.  Defendant Cherry Hill Township School District is the District governing the High School at which Plaintiff's children attend.

## STATEMENT OF FACTS

19.  Plaintiff, his wife, and their three children reside in Camden County, NJ. Plaintiff's three children attend school in the Cherry Hill Township Public School District.

20.  In 2017, the NJ Legislature passed, and Governor Chris Christie signed, N.J.S.A. 18A:36-41, which directs the

Commissioner of the NJ DOE to "establish guidelines to provide direction for schools in addressing common issues concerning the needs of transgender students, and to assist schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students."[3]

**NJ Guidance – the Policy implemented by Cherry Hill**

21.  The NJ Guidance document sets forth a model policy, which in numerous respects, unconstitutionally interferes with Plaintiff's right to direct the care and upbringing of his children and his right to make healthcare/medical decisions for his children. The NJ Guidance document, further, extends beyond its authority conferred by N.J.S.A. 18A:36-41. Salient, relevant portions of the NJ DOE Guidance document are as follows:[4]

- "Schools and school districts are encouraged to communicate openly, albeit confidentially, with students regarding their transgender status or gender identity. Proper communication with the student will ensure that appropriate steps are taken to determine a student's preferences and address potential privacy concerns and associated risks to the student's well-being."

---

[3] NJ DOE Guidance:
https://www.nj.gov/education/safety/sandp/climate/docs/Guidance.pdf
[4] All of the ensuing extracts are direct quotes from the NJ DOE Guidance model policy: https://www.nj.gov/education/safety/sandp/climate/docs/Guidance.pdf

<u>Student-Centered Approach</u>

- "A school district shall accept a student's asserted gender identity; parental consent is not required. Further, a student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the district, school or school personnel."

- "Nor is a legal or court-ordered name change required. There is no affirmative duty for any school district personnel to notify a student's parent or guardian of the student's gender identity or expression."

- "School district personnel should have an open, but confidential discussion with the student to ascertain the student's preference on matters such as chosen name, chosen pronoun to use, and parental communications."

- "School districts shall ensure that a transgender student is addressed at school by the name and pronoun chosen by the student, regardless of whether a legal name change or change in official school records has occurred."

- "School districts shall issue school documentation for a transgender student, such as student identification cards, in the name chosen by the student."

- "A transgender student shall be allowed to dress in accordance with the student's gender identity."

- "School districts should discuss with the student, and any other individuals at the student's request, the risks associated with the student's transgender status being inadvertently disclosed."

<u>Confidentiality and Privacy</u>

- "School personnel may not disclose information that may reveal a student's transgender status except as allowed by law. Schools are advised to work with the student to create an appropriate confidentiality plan regarding the student's transgender or transitioning status."

- "A school district shall keep confidential a current, new, or prospective student's transgender status. Schools should address the student using a chosen name; the student's birth name should be kept confidential by school and district staff."

- "Due to a specific and compelling need, such as the health and safety of a student or an incident of bias-related crime, a school district may be obligated to disclose a student's status."

- "During a Harassment, Intimidation, or Bullying investigation a school district is obligated to develop

a procedure to report, verbally and in writing, an act of harassment, intimidation, and bullying (HIB) committed by an adult or youth against a student, pursuant to N.J.A.C. 6A:16-7.7(a)2viii. In this instance, the school district should inform the student of the school's obligation to report the findings of the HIB investigation pursuant to N.J.S.A. 18A:37-15(d), which permits the parents or guardians of the students who are parties to the investigation to receive information about the investigation in accordance with federal and state law and regulation."

Student Records

- "If a student has expressed a preference to be called by a name other than their birth name, permanent student records containing the student's birth name should be kept in a separate, confidential file."

- "A separate file containing records bearing the student's chosen name may also be kept."

22. As indicated by the above quotes, the NJ guidance document provides that schools shall keep confidential a student's transitioning or transgender status, and that schools have no affirmative duty to notify parents regarding same, absent a rare exception (i.e., compelling need for health, safety, or

harassment/bullying related event).

23.  Besides obviating parents from learning of the student's desire for gender identity change or status, the Guidance invites students to have open but confidential conversations with school district personnel regarding their gender identity or status. These are serious conversations that do not feature parental involvement.

24.  Schools are then required to accept a student's gender identity alteration request without parental consent, and such chosen gender identity and pronouns are required to be utilized by school personnel. This gender identity change can occur without any threshold diagnosis or treatment. The student can dress in accordance with his/her preferred gender identity.

25.  Separate and distinct school files/records are required for the birth name and chosen name, and school personnel are directed to amend all pertinent personally identifying document so as to ensure consistency, "To ensure consistency among teachers, school administrators, substitute teachers and other staff, every effort should be made to immediately update student education records (for example, attendance records, transcripts, Individualized Education Programs, etc.)."[5]

26.  Accordingly, not only are parents entirely removed from

---

[5] Id.

the conversation regarding a student's gender identity/status, but through the school's facilitation, transitioning or transgender students can lead double-lives whereby they adopt different name, pronouns, and apparel than is the case in their home life or other areas of their lives.

27.  The Guidance actively promotes deceit, wherein confidential conversations - regarding the very grave subject matter of gender identity – are conducted outside the realm of the family circle, where such conversations should rightfully be. The Guidance directs school districts, such as Cherry Hill Public School Districts, to obviate parents from partaking in these highly important issues.

28.  The Cherry Hill Board of Education adopted the NJ DOE's Guidance in 2019, inclusive of all the verbiage quoted hereinabove and contained in the cited NJ Guidance document. This policy was imposed as a requirement on the student population and by extension, their parents.

29.  As such, the fulcrum of this action is the interference of the Cherry Hill School District policy (adoption of NJ Guidance) with Plaintiff's right to the care, custody and upbringing of his children, and moreover, his right to direct the healthcare and medical decisions of his children. The Policy unconstitutionally impinges upon these rights.

30.  Regarding healthcare/medical decisions, it has been

established by numerous experts in the field of psychology that gender dysphoria, transgenderism, gender identity, or otherwise confusion about gender, are immanently psychological. Social transitioning/gender identity transitioning is in fact a psychotherapeutic intervention for which parental notification, consent, and participation is highly beneficial if not necessary in most instances.

31. Dr. Stephen Levine is an illustrious scientist in the field of psychiatry, with a concentration in the very issues which are the fulcrum of this action.

**Dr. Stephen Levine**

32. Dr. Stephen Levine is a Clinical Professor of Psychiatry at Case Western Reserve University School of Medicine, and maintains an active private clinical practice. He received his MD from Case Western Reserve University in 1967, and completed a psychiatric residency at the University Hospitals of Cleveland in 1973. He became an Assistant Professor of Psychiatry at Case Western in 1973, and became a Full Professor in 1985.[6]

33. Since July 1973 his specialties have included psychological problems and conditions relating to sexuality and sexual relations, therapies for sexual problems, and the

_____
[6] See Exhibit A – Dr. Levine Expert Report from another action, p. 1. Dr. Levine's full CV is set forth in Exhibit B (Dr. Levine expert report from another case with full CV).

relationship between love and intimate relationships and wider mental health.[7]

34.  Dr. Levine is a prodigious publisher, and has testified at trial and depositions in numerous cases, as denoted in Exhibit A attached herewith. His views are predicated upon "the type of facts reasonably relied upon by experts" within his field, and furthermore, his opinions are held with a "reasonable degree of certainty" within his field.[8]

35.  The following are relevant extracts from Dr. Levine's affidavits in other cases which are also highly pertinent to the case at bar.

**Dr. Levine on Gender Identity Issues and Parental Involvement**

36.  **"[S]ocial transition is itself an important intervention with profound implications for the long term mental and physical health of the child** [Emphasis added]. When a mental health professional evaluates a child or adolescent and then recommends social transition, presumably that professional is available to help with interpersonal, familial, and psychological problems that may arise. However, many adolescents transition without mental health assessment and ongoing care, leaving themselves and their

---

[7] Id. at p. 1.

[8] Id. at p. 2.

families on their own to deal with subsequent problems."[9]

37.  "In most cases, **parental involvement is necessary for an accurate and thorough diagnosis of a child or adolescent presenting with gender dysphoria or a desire for a transgender identity**, as well as for effective psychotherapeutic treatment and support of the young person [emphasis added]."[10]

38.  "There are no studies that show that affirmation of transgender identity in young children reduces suicide, suicidal ideation, or improves long-term outcomes as compared to other therapeutic approaches. Meanwhile, multiple studies show that adult individuals living transgender lives suffer much higher rates of suicide and negative physical and mental health conditions than does the general population."[11]

39.  "Putting a child or adolescent on a pathway towards life as a transgender person puts that individual at risk of a wide range of long-term or even life-long harms, including: sterilization (whether chemical or surgical) and associated regret and sense of loss; inability to experience orgasm (for trans women); physical health risks associated with exposure to elevated levels of cross-sex hormones; surgical complications and life-long after-care; alienation of family relationships; inability to form

---

[9] Id. at p. 4.

[10] Id.

[11] Id.

healthy romantic relationships and attract a desirable mate; elevated mental health risks."[12]

40. "For many reasons, in the large majority of cases the involvement of **one or both parents will be essential to a responsible, effective, and indeed ethical diagnosis and treatment** of a child who is or may be suffering from gender dysphoria or one of the related conditions [emphasis added]."[13]

41. "**Parental involvement is necessary for accurate and thorough diagnosis of the child** and to discern familial and intrapsychic forces that may contribute to moving the child towards a trans identity [emphasis added]."[14]

42. "A claim or expression of interest in a transgender identity by a child must be the beginning, not the end, of a careful diagnostic and therapeutic process. Transgender identification in a child is not a simple, uniform phenomenon; as I have explained, there is no single pathway of development and outcomes governing transgender identity, nor one that predominates over the large majority of cases. Instead, as individuals grow up and age, depending on their differing psychological, social, familial, and life experiences, their outcomes differ widely."[15]

---

[12] Id. at 5.

[13] Id. at 27.

[14] Id. at 27.

[15] Id. at 27-28.

43.  **"What can be observed by — for example — a teacher or counselor at school, although important, is only one window into the life and psyche of a child.** A teacher's perspective emphasizes learning capacities, social interactions, and gender style relative to other similarly aged children, often during just one school year [emphasis added]."[16]

44.  "As a starting point, **any child suffering serious tension between his or her reproductive biology and sense of gender identity (or desired gender identity) should have the assistance and support of a skilled mental health professional,** and a meaningful diagnosis of the child's condition will require a sustained relationship between an MHP and the child over time. **The involvement of parents will often be essential to establishing and maintaining this type of relationship between an MHP and the child** [emphasis added]."[17]

45.  "'The child may or may not actually suffer from gender dysphoria, and this should be determined. **Input from parents is likely to be important to evaluating whether a child is suffering from 'clinically significant distress or impairment in social, school, or other important areas of functioning** [emphasis

---

[16] Id. at 28.

[17] Id.

added].'"[18]

46.  "**Parents, similarly, in many cases will have observed the child over his or her entire lifetime, and so will have unique insight** into whether the child's attraction to a transgender identity is longstanding and stable, or whether on the contrary it has been abrupt and associated with intensive online interaction with transgender 'communities [emphasis added].'" [19]

47.  "Likewise, when parental or family dynamics play a role in the child's discomfort with his or her natal sex it will not be possible to evaluate these influences without parental involvement in the diagnostic and therapeutic process. A thorough evaluation cannot be done as effectively in a short period. Ideally a long-term relationship with parents enables a clear picture of what happened in the family and to the child because a different level of trust often occurs over time between the parents and the MHP."[20]

48.  "**A large proportion of children (and adults) who present with claims of or attraction to a transgender identity suffer from identifiable psychiatric co-morbidities.** Regardless of whether these are in any way related to the child's gender identity, it is

---

[18] Id. at 29.

[19] Id.

[20] Id.

important that these co-morbidities — if they exist — be identified and that appropriate psychotherapeutic help is obtained for the child [emphasis added]."[21]

49. "A 2017 study from the Boston Children's Hospital Gender Management Service program reported that: 'Consistent with the data reported from other sites, this investigation documented that 43.3% of patients presenting for services had significant psychiatric history, with 37.1% having been prescribed psychotropic medications, 20.6% with a history of self-injurious behavior, 9.3% with a prior psychiatric hospitalization, and 9.3% with a history of suicide attempts.' (L. Edwards-Leeper, Psychological Profile, at 375.). It seems likely that an even higher proportion will have had prior undiagnosed psychiatric conditions."[22]

50. "At the very least, then, a child who exhibits or expresses an interest in a transgender identity should be evaluated for psychiatric co-morbidities. **Again, parental involvement will generally be essential for this to be done, and to be done well** [emphasis added]."[23]

51. "**Parental involvement is important for effective psychotherapeutic treatment and support of the child** [emphasis

---

[21] Id.

[22] Id. at 22-23.

[23] Id. at 30.

added]."[24]

52. "Since the child's sense of gender develops in interaction with his parents and their own gender roles and relationships, the responsible MHP will almost certainly need to delve into family and marital dynamics. **An ongoing relationship between the MHP and the parents and the child is vital to help the parents, child, other family members, and the MHP to understand the issues that need to be dealt with over time by each of them** [emphasis added]."[25]

53. "For a child to live **radically different identities at home and at school**, and to **conceal what he or she perceives to be his or her true identity from parents**, is **psychologically unhealthy** in itself, and could readily lead to additional psychological problems . . . **Extended secrecy and a 'double life'** concealed from the parents is **rarely the path to psychological health**. For this reason, at least, **schools should not support deceit of parents** [emphasis added]."[26]

54. Dr. Levine is far from the only expert in the field who maintains these positions.

**Dr. Anderson, Ph.D on Gender Identity and Parental Involvement**

55. The following are direct quotes from Dr. Erica E.

---

[24] Id.

[25] Id.

[26] Id. at 31.

Anderson, Ph.D., who submitted an amicus brief in another case.[27] She is a clinical a **"clinical psychologist practicing in Berkeley, California, with over 40 years of experience, and is transgender herself**. Between 2019 and 2021, Dr. Anderson served as a board member for the World Professional Association for Transgender Health (WPATH) and as the President of USPATH (the United States arm of WPATH). Since 2016, Dr. Anderson's work has focused primarily on children and adolescents dealing with gender-identity-related issues, at the Child and Adolescent Gender Clinic at Benioff Children's Hospital at the University of California, San Francisco (2016 to 2021), and at her private consulting and clinical psychology practice (2016 to present). She has seen hundreds of children and adolescents for gender-identity-related issues in that time, many of whom transition, with her guidance and support [emphasis added]."[28]

56.  Congruent with Dr. Levine's views, Dr. Anderson likewise finds that social/gender transitioning should properly be characterized as "an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning."[29]

57.  Furthermore, Dr. Anderson explains, "**Every major**

---

[27] See Exhibit C, Amicus Brief in Case No. 8-20-cv-3552-PWG.

[28] Exhibit C.

[29] Id. at 6.

**professional association recommends a thorough professional evaluation to assess, among other things, the underlying causes of the child's or adolescent's feelings and consider whether a transition will be beneficial.** The American Psychological Association, for example, recommends a 'comprehensive evaluation' and consultation with the parents and youth to discuss, among other things, 'the advantages and disadvantages of social transition during childhood and adolescence.' The Endocrine Society likewise recommends 'a complete psycho-diagnostic assessment [emphasis added].'"[30]

58. She continues, "Another reason for professional involvement is to assess whether the child or adolescent needs mental-health support. Many transgender youth experience dysphoria—psychological distress—associated with the mismatch between their natal sex and perceived or desired gender identity."[31]

59. Moreover, she concludes, "It should go without saying, but **parents cannot obtain a professional evaluation, screen for dysphoria and other coexisting issues, or provide professional mental-health support for their children, if their school hides from them what is happening at school.** To summarize, no professional association recommends that teachers and school

---

[30] Id. at 10–11.
[31] Id. at 13.

officials, who have no expertise whatsoever in these issues, should facilitate a social transition while at school, treating minors as if they are really the opposite sex, in secret from their parents, solely because they are concerned that their parents might not be 'supportive' of a transition [emphasis added]."[32]

60. Therefore, in view of the positions of all professional organizations, and the expert views of both Dr. Levin and Dr. Anderson, when a young person exhibits a desire to transition, or is otherwise experiencing gender confusion, professional examination is warranted. In order to make a complete, accurate diagnosis and thereupon facilitate appropriate interventions, if needed, parental involvement is needed. Parents can and do elucidate the fuller picture of that child's life so as to contextualize a young person's seemingly sudden desire to change their gender identity. School personnel can conceivably only provide one window into the lives of youth, as they are not present in, nor do they observe, that child's life outside the walls of the school.

61. It follows, a fortiori, that the NJ DOE's Guidance document, adopted by the Cherry Hill School District, unconstitutionally interferes with Plaintiff's right to direct the care, upbringing and healthcare decisions of his children. The

---

[32] Id. at 14-15.

policy has imparted a constitutional injury to Plaintiff by continually interfering with his parental rights on a daily basis, and driving a wedge between himself and his children.

62. Cherry Hill School District, through this policy of confidentiality and secrecy, facilitates conversations about gender identity with Plaintiff's children, conversations which should occur within the ambit of family life, as they concern grave matters of upbringing and psychological health. Plaintiff would not cognize/become aware of his child/children's gender identity change given this policy of secrecy, and should not be required to wait until such time (which is indeterminate), as Plaintiff is harmed now by this impingement of his rights.

63. Any of Plaintiff's children could at any point, undertake this psychotherapeutic intervention (as Dr. Levine characterizes it), change their name, pronouns, apparel, and begin living a double life of deceit and secrecy without Plaintiff's knowledge or consent for an indeterminate amount of time prospectively.

## FIRST COUNT

### Violation of Fourteenth Amendment, Substantive Due Process, United States Constitution

64. Plaintiff incorporates by reference all other

allegations of this Complaint.

65. Plaintiff's Fourteenth Amendment, fundamental, substantive due process right to direct the upbringing, care, and healthcare decisions of his children has been violated through the issuance of NJ DOE Guidance's and subsequent adoption by the Cherry Hill Board of Education. This policy is mandatory and both Plaintiff and his children are subject to it on a daily basis. The Policy continually interferes with the parent-child relationship and impinges on Plaintiff's parental rights.

66. The Policy facilitates double-lives of secrecy whereby Plaintiff's children are invited to converse with school personnel about matters (matters of psychological implications) which should fall within the purview of Plaintiff.

67. It is well established United States Supreme Court jurisprudence that parents maintain a fundamental right to the care, custody, and upbringing of their children, as enshrined by the Fourteenth Amendment Substantive Due Process Clause.

68. "[T]he interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 85 (2000); see also, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (holding that parents have a liberty interest "to direct the upbringing and education of children under their control" and further that "the child is not

the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations").

69. "It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'comes to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).

70. "[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000); see also, *Prince v. Massachusetts*, 321 U.S. 158 (1944).

71. Through adoption of the NJ Guidance which facilitates the fracturing of the parent-child relationship, the Cherry Hill Policy injects "itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children." *Troxel v. Granville*, 530 U.S. 57, 59 (2000).

72. Issues of gender confusion/identity and students' attendant decisions to transition are critical determinations which "parents have an important 'guiding role' to play in the upbringing of their children . . . **which presumptively includes**

**counseling them on important decisions** [emphasis added].” *L. v. Matheson*, 450 U.S. 398, 410 (1981).

73.  A 3rd Circuit case found that matters of gender identity are ostensibly within the ambit of parents' fundamental right to the upbringing of their children, "**Teaching a child how to determine one's gender identity at least plausibly is a matter of great importance that goes to the heart of parenting** [emphasis added].” *Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 320 (2022).

74.  Additionally, parents maintain a fundamental right to direct the medical care of their children, housed within the substantive due process clause of the Fourteenth Amendment. "[T]he Supreme Court has strongly suggested that minor children lack a liberty interest in directing their own medical care . . . Instead, children must instead rely on parents or legal guardians to do so until they reach the age of competency . . . **Accordingly, any substantive due process rights related to directing the medical care of children devolve upon the parents or legal guardians of the children, rather than the children themselves** [emphasis added].” *Kanuszewski v. Mich. HHS*, 927 F.3d 396, 414-15 (2019).

75.  By obstructing the flow of information from schools to the parents on the critical subject of gender identity, the NJ Guidance (and Cherry Hill Policy) presume Plaintiff (and all parents) are unfit to parent his children (their children). But

when the "state moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures[33] . . . [b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."[34]

76.    In other words, it is not constitutionally permissible to usurp the authority of the parent without requiring sufficient evidence of harm. By removing Plaintiff (and other parents) from the equation, the NJ Guidance and by extension, Cherry Hill School District, strips Plaintiff of his parental rights. They presume parental unfitness where no sufficient showing of same has been made.

77.    Therefore, Plaintiff Short has been constitutionally harmed as the NJ Guidance and Cherry Hill Policy contravene his fundamental parental right to direct the medical/health care decisions of his children and his fundamental parental right to the care and upbringing of his children. The Policy interferes with and impinges upon his rights daily, as the Policy fosters and promotes confidential conversations between his children and school personnel about issues which carry grave psychological

---

[33] *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982).

[34] Id. at 744.

ramifications. This facilitation of double lives, secrecy, and deceit is imposed upon Plaintiff and his children by the Cherry Hill Policy.

78. Notwithstanding the current transgender or transitioning status of Plaintiff's children, Plaintiff will likely have no knowledge – from the school - of a gender identity change in his children. Such lack of knowledge could continue prospectively for an indeterminate time – weeks, months, or even years.

79. Plaintiff's fundamental parental right to discuss matters of importance, of which gender identity is one, has, is, and will continue to be obstructed by way of the Cherry Hill Policy derived from the NJ DOE Guidance. His fundamental right to counsel his children on matters of gender identity, which is squarely a healthcare issue, have been removed from his ambit and placed within the control of school personnel who only observe a small window of his children's lives.

80. Thus, Plaintiff's Fourteenth Amendment substantive due process fundamental right to direct his children's healthcare decisions, and his right to the care and upbringing of his children, have been contravened by the NJ DOE Guidance and the Cherry Hill Policy.

## SECOND COUNT

### THE NJ DOE GUIDANCE IS ULTRA VIRES, AS IT IS BEYOND THE AUTHORITY GRANTED TO IT BY ITS ENABLING STATUTE, IN VIOLATION OF THE NJ ADMINISTRATIVE PROCEDURES ACT

81. Plaintiff incorporates by reference all other allegations of this Complaint.

82. Ab initio, for agency guidance to be subject to judicial review, there must be final agency action, namely, "the action must (1) mark the consummation of the agency's decision-making process, that is, not be of a merely tentative or interlocutory nature; and (2) be an action by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

83. That is the case here. The NJ DOE's Guidance was issued in September 2018, by way of the enabling statute, N.J.S.A. 18A:36-41, which directed the Commissioner of the DOE to develop the guidance.

84. This guidance was implemented, and hundreds of NJ school districts adopted it as their school policy.

85. Recently, the NJ State Attorney General filed lawsuits against several NJ school districts for alleged non-compliance with the NJ Law Against Discrimination, N.J.S.A. § 10:5-12 et seq.

86. In these lawsuits, the Attorney General invoked the NJ Guidance, alleging that those school districts policies were "inconsistent with established guidance from the New Jersey

31

Department of Education."[35] The complaint cited to various sections of the Guidance, including those cited hereinabove regarding the non-disclosure of students' transgender status.

87.   It is then ostensible that prong two of the final agency action test, enunciated in *Bennet,* has been satisfied, as the State of New Jersey construes the NJ DOE Guidance implementation as an action from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

88.   Given the NJ Guidance is subject to judicial review, the Guidance violates N.J.S.A. 18A:36-41 due to the fact that the Guidance is incongruous with the import of the enabling statute, and exceeds the authority conferred to it by its enabling statute, in contravention of the NJ Administrative Procedures Act ("APA"), N.J.S.A. § 52:14B-1 et seq.

89.   N.J.S.A. 18A:36-41, the enabling statute concerning "[D]evelopment, distribution of guidelines concerning transgender students," does not evince an intent to obviate parents from learning about their children's transitioning or transgender status. While the statute contains the word "confidential," contextualizing that word leads to a conclusion that it does not apply to parents.

90.   The sole explicit mention of parents in N.J.S.A. 18A:36-

---

[35] Exhibit D – Verified Complaint of State Attorney General, p. 1.

41 is in subsection (c), which provides in pertinent part, "The **guidelines shall** include information on organizations or other **resources available to students and parents that provide support to transgender individuals** [emphasis added]."

91.  This language evinces an intent to **include parents**, not to disallow them from participating in the conversation.

92.  Moreover, the legislative intent is further evinced by the sponsors' statements in connection with the law, including, the following statement from Assemblywoman Valerie Vainieri Huttle (D-Bergen), one of the sponsors, "These guidelines are needed to ensure that transgender students can safely be themselves without fear of being persecuted, and can help promote a culture of understanding and acceptance that will hopefully influence how students treat each other in and outside of school."[36]

93.  Assemblywoman Marlene Caride (D-Bergen), another sponsor, stated: "If we cultivate intolerance, children will pick up on that and think it is OK to bully others who are deemed different."[37]

94.  All of the sponsors' statements indicate an intent to facilitate a tolerant, safe atmosphere in schools, but not to keep confidential information regarding the student's gender status

---

[36] https://www.nj.com/politics/2017/07/christie_signs_law_to_protect_nj_transgendered_stu.html
[37] Id.

from their parents. In fact, subsection (c) indicates the inverse, namely that parents should be involved in the conversation.

95. But the NJ DOE Guidance goes far beyond what the legislators intended, and what is explicitly enumerated in the statute itself. It directs schools to keep confidential a student's transitioning or transgender status, it removes parents from these confidential conversations, and provides that schools do not have any duty to notify parents about the student's transgender status, use or name, pronoun, or otherwise.

96. As such, the NJ DOE Guidance contravenes its enabling statute by exceeding the authority conferred to it and derogating from the intended import of the enabling statute.

97. Therefore, the NJ Guidance document, in addition to violating the Fourteenth Amendment substantive due process clause of the U.S. Constitution, should also be stricken because it violates the NJ APA by exceeding the authority conferred to it by its enabling statute.

## THIRD COUNT

### VIOLATION OF 42 U.S. CODE § 1983

98. Plaintiff incorporates by reference all other allegations of this Complaint.

99. 42 U.S.C. 1983 provides in pertinent part: "Every person

who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ."

100. NJ DOE, through execution and issuance of the Guidance document, and Cherry Hill Board of Education and Cherry Hill Superintendent, through adoption and imposition of the Policy, have violated clearly established law by depriving Plaintiff of his rights, privileges, and immunities secured by the United States Constitution.

101. The NJ Guidance and Cherry Hill Policy, which secretes information about students' transitioning or transgender statuses from parents, constitutionally harms Plaintiff. The continual interference of this Policy with his parental rights, sacrosanct under the Fourteenth Amendment substantive due process clause, has deprived him of his rights, privileges and immunities.

## PRAYER FOR RELIEF

102.   Plaintiff   incorporates   by   reference   all   other allegations of this Complaint.

103. A Declaration that the NJ DOE Guidance, and Cherry Hill Public School District Policy, is unconstitutional in violation of the Fourteenth Amendment of the United States Constitution. The NJ DOE   Guidance   and   Cherry   Hill   Policy   impinge   upon   Plaintiff's fundamental rights to direct the medical/healthcare decisions of his children and his fundamental right to the care and upbringing of   his   children.   The   Policy   and   Guidance   continually   harms Plaintiff by removing him from conversations between the school and his children about their gender identity, conversations which incontrovertibly   carry   psychological   implications   and   are   thus healthcare decisions. These conversations are important matters, as jurisprudence indicates, are rightly held within the purview of parents. The Policy obstructs Plaintiff's ability to care for and direct the upbringing of his children.

104. A Declaration that the NJ DOE Guidance is ultra vires, in violation of its enabling statute, N.J.S.A. 18A:36-41, and the NJ APA, as the Guidance is incongruous with N.J.S.A. 18A:36-41, and exceeds the authority conferred to it by same.

105. A Declaration that the NJ DOE Guidance and Cherry Hill Policy violate 42 U.S.C. 1983.

106. An injunction obviating Cherry Hill Public School District from continuing to impose this Policy on the students and their parents.

107. An injunction obviating the NJ DOE from continuing to impose the transgender Guidance on NJ schools.

108. An order directing the NJ DOE and by extension, Cherry Hill Board of Education, to set aside/strike the Guidance and Policy. Alternatively, an order to amend the Guidance and Policy such that they require parental notification when a student expresses a desire or inclination to alter his/her gender, name, pronouns, apparel, or otherwise, evinces a desire to alter his/her gender identity; an order to amend the Guidance and Policy such that they require parental consent when a student expresses a desire or inclination to alter his/her gender, name, pronouns, apparel, or otherwise, evinces a desire to alter his/her gender identity; and, an order to amend the Guidance and Policy such that the confidentiality provisions of the NJ DOE Guidance and Policy are applicable to all persons **except for** students' parents and/or guardians.

109. An award of attorney's fees and the expenses of this litigation.

110. Such other relief as this Court deems proper.

Dated: October 12, 2023

Respectfully submitted,


*/s/ Thomas Stavola, Jr.*
Thomas Stavola, Jr., Esq.
NJ Bar ID number: 380012022
Law Office of Thomas Stavola,
Jr., LLC
209 County Road 537
Colts Neck, NJ 07722
E: tstavolajr@stavolalaw.com
P: 732-790-0639
*Counsel for Plaintiff – Frederick
K. Short Jr.*