## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **FREDERICK K. SHORT, JR.** and **TAMATHA COSTELLO,** | **Case No. 23–cv–21105–ESK–EAP** |
| **Plaintiffs,** | |
| **and** | **OPINION** |
| **EDITH MALDONADO** | |
| **Intervenor Plaintiff,** | |
| **v.** | |
| **NEW JERSEY DEPARTMENT OF EDUCATION,** *et al.*, | |
| **Defendants.** | |

**KIEL, U.S.D.J.**

     **THIS MATTER** is before the Court on defendants Cranford Public Schools and Cranford High School's (Cranford Defendants) [1] motion for

---

[1] The amended complaint names Cranford Board of Education and Cranford Public School District as defendants. (ECF No. 6 (Am. Compl.) p. 8.) Cranford Defendants comprised of Cranford Public Schools and Cranford High School answered and move here. (ECF No. 23 (Cranford Defs.' Answer), ECF No. 76.) The letters accompanying these filings refer to Cranford Board of Education, however. (Cranford Defs.' Answer p. 1, ECF No. 76 p. 1.) It is not uncommon in the Court's experience for an entity distinct from that which is named in a complaint to appear. I note only that this difference is inconsistent in the filings and not otherwise addressed in Cranford Defendants' answer or the pending motion papers.

judgment on the pleadings[2] as to the amended complaint (ECF No. 76)[3] and Cherry Hill Defendants' motion for judgment on the pleadings as to the amended complaint (ECF No. 78) and motion to dismiss the intervenor complaint (ECF No. 79). For the following reasons, the motions will be GRANTED.

## I.    BACKGROUND

Plaintiff Frederick K. Short resides with his wife and three children in Camden County. (Am. Compl. p.7.) All three of his children are unemancipated minors who attend high school in Cherry Hill School District. (*Id.*) Plaintiff Tamatha Costello resides in Cranford with her child, who

---

[2] Cranford Defendants assert that, after administratively terminating their original post-answer motion to dismiss, I "expressly permitted its refiling." (ECF No. 76 p.14.) This is inaccurate. I explained to defendants Cherry Hill Board of Education and Cherry Hill School District (Cherry Hill Defendants) and Cranford Defendants that their motions to dismiss were improper and would remain administratively terminated because courts do not have discretion under Federal Rule of Civil Procedure (Rule) 12(b) to permit post-answer motions to dismiss. (ECF No. 64 (May 15, 2024 Order).) I thereafter provided them leave to file dispositive motions under Rules 12(b) and 12(c) with the post-hearing understanding that Cherry Hill Defendants would file a pre-answer Rule 12(b) motion as to the intervenor complaint and Cherry Hill and Cranford Defendants would file Rule 12(c) motions as to the amended complaint. (ECF No. 74 (June 17, 2024 Order).) For reasons unclear, Cranford Defendants have filed another post-answer motion to dismiss. (ECF No. 76.) Rather that prolonging this litigation by terminating the untimely motion at the expense of the Court and parties' collective time, I exercise my discretion in converting the Rule 12(b) motion to dismiss to a Rule 12(c) motion for judgment on the pleadings. *See Internet Prods. LLC v. LLJ Enters., Inc.*, Case No. 18–15421, 2020 WL 6883430, at *3 (D.N.J. Nov. 24, 2020).

[3] My typical convention is to label non-motion filings when they will be referred to multiple times over the course of an opinion. Cranford Defendants' filing at ECF No. 76 includes a letter, notice of motion, affidavit of counsel, and supporting brief in a single document. To avoid confusion, I will break my convention and simply refer to this filing as "ECF No. 76" in all instances.

attended public school in Cranford from kindergarten until the seventh grade before leaving the district.    (*Id.*)[4]

## A.    The Guidance and District Policies

In 2017, the New Jersey Legislature passed, and Governor Chris Christie signed into law, N.J. Stat. Ann. §18A:36–41.    (*Id.* pp.9, 10.)    The statute directed the Commissioner of Education to develop guidelines addressing the needs of transgender students and assisting schools in developing supportive and nondiscriminatory environments for transgender students.    (*Id.* p.10.)    The New Jersey Department of Education thereafter issued Transgender Student Guidance for School Districts (Guidance).    (*Id.* pp.2, 10)[5]    Relevant to the pending motions, the Guidance's provisions encourage schools to communicate openly but confidentially with students regarding their transgender status or identity, name and pronoun preferences, and whether to notify parents; state that districts shall accept a student's asserted gender identity without the need for a medical diagnosis, legal name change, or parental consent; and require schools to keep students' transgender statuses confidential absent specific excepted reasons such as health and safety and legally required disclosure.    (*Id.* pp.10–13.)

The Cherry Hill Board of Education adopted the Guidance into a policy in 2019.    (*Id.* p.15.)    The Cranford Board of Education adopted the Guidance into a policy in 2020.    (*Id.*)    Short and Costello allege that the "[f]ulcrum of this

---

[4] The original complaint named only Short as a plaintiff.    (ECF No. 1 pp.6, 7.)

[5] The amended complaint and intervenor complaint largely refer to both the Guidance and individual school policies.    (*See generally* Am. Compl., ECF No. 44 (Intervenor Compl.).)    On July 16, 2024, I dismissed all claims against the New Jersey Department of Education and Acting Commissioner Angelica Allen-McMillan (State Defendants).    *See Short v. N.J. Dep't of Educ.*, Case No. 23–21105, 2024 WL 3424729 (D.N.J. July 16, 2024).    This opinion therefore refers to allegations as to the individual policies even though the complaints themselves may refer to the policies and Guidance in tandem.

action" is the policies' interference with their right to the care, custody, and upbringing of their children and right to direct healthcare and medical decisions for their children.  (*Id.* pp. 15, 16.)  Students are invited to have open but confidential conversations about their gender identities with district personnel—important conversations from which parents are excluded.  (*Id.* p. 14.)  Schools must also accept a student's gender identity without parental consent and that identity carries over to attendance records, individualized education programs, transcripts, and similar records.  (*Id.*)  The amended complaint quotes liberally from the opinions of Dr. Stephen Levine, M.D., clinical professor of psychiatry at Case Western Reserve University School of Medicine, and Dr. Erica E. Anderson, Ph.D., a clinical psychologist and former member of the World Professional Association for Transgender Health.  (*Id.* pp. 16–26.)[6]  These opinions pertain to the significance and complexity of social transitioning, the benefits of parental involvement, and similar considerations.  (*Id.*)

## B.    <u>Short and Costello's Claims</u>

Short contends that he is and will continue to be harmed by the Cherry Hill policy as he and his children are forced to participate in, and are subject to, the policy.  (*Id.* p. 4.)  He is deliberately excluded from conversations about his children's identities.  (*Id.*)  His children may—at any time—adopt new gender identities and live "double lives" without his notice or consent, an interference with his constitutional rights that will only end if his children decide to disclose their statuses to him or otherwise permit disclosure.  (*Id.*)

---

[6] The cited amicus brief of Dr. Anderson was submitted to the Fourth Circuit prior to its decision in *John and Jane Parents 1 v. Montgomery County Board of Education*, 78 F.4th 622 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2560 (2024).  (ECF No. 1–8.)  This opinion will be discussed at greater length *infra*.

Costello asserts that she has already been harmed by the Cranford policy as her child changed their gender identity without her knowledge or consent. (*Id.* pp. 4, 5.) While her child was in seventh grade, their school—primarily through a guidance counselor—held confidential conversations with them regarding their gender identity. (*Id.* p. 9.) "The school assisted with the child's delusional, self-diagnosis (at age 12) of being born in the wrong body, essentially alluding to the fact that she/he was not good enough as God intended, affirmed the child's new identity and then praised the child for being brave and courageous." (*Id.*) Costello removed her child from the school after the seventh grade. (*Id.*) The school's actions "plunged [Costello's] child into gender dysphoria" and Costello has had to restabilize her child's mental health and pay burdensome annual tuition costs as a result. (*Id.*)

Short and Costello bring claims of violation of their Fourteenth Amendment substantive due process rights and under 42 U.S.C. §(Section) 1983. (*Id.* pp. 28–33, 37, 38.)[7] They seek, among other relief, a declaration that the policies are unconstitutional, an injunction against Cherry Hill Defendants from continuing to impose their policy on parents and students, an order setting aside Cherry Hill and Cranford's policies or amending them to require parental notice and consent and exclude parents and guardians from confidentiality provisions, and an order directing Cranford Defendants to reimburse Costello for tuition expenses from eighth grade through the completion of high school. (*Id.* pp. 38–40.)

---

[7] Count 2 of the amended complaint alleged that the Guidance was *ultra vires* and in violation of the New Jersey Administrative Procedures Act. (Am. Compl. pp. 33–37.) This allegation does not implicate Cherry Hill or Cranford Defendants. Additionally, though Short and Costello assert causes of action under both the Fourteenth Amendment and Section 1983, it is important to note that "[Section] 1983 does not confer any substantive rights, but merely 'provides a method for vindicating federal rights elsewhere conferred.'" *Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017) (quoting *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014)).

## II.    PROCEDURAL HISTORY AND INTERVENOR COMPLAINT

Cherry Hill and Cranford Defendants answered the amended complaint on November 27, 2023 and December 8, 2023, respectively.    (ECF Nos. 16, 23.) District Judge Robert Kirsch later granted Cherry Hill and Cranford Defendants leave to file post-answer motions to dismiss.    (ECF No. 35.)

On January 24, 2024, intervenor plaintiff Edith Maldonado moved to intervene (ECF No. 33), which Magistrate Judge Douglas E. Arpert (Ret.) granted (ECF No. 43).    Maldonado is a Camden County resident with two children attending school in Cherry Hill School District.    (Intervenor Compl. p. 3.)    The intervenor complaint alleges that the Cherry Hill policy requires affirmation and acceptance of the proposition that gender identity is fluid and may be determined by a student's feelings, emotions, and choices without a medical diagnosis or treatment.    (*Id.* p. 6.)    She asserts that the policy offends freedom of religion.    (*Id.* pp. 7, 8.)

Count One of the intervenor complaint asserts equal-protection violations under the Fourteenth Amendments of the United States and New Jersey Constitutions.    (*Id.* pp. 8–10.)    Maldonado alleges that the Cherry Hill policy unnecessarily seeks to prevent discrimination against transgender students at the expense of students' religious beliefs.    (*Id.* p. 8.)    Cherry Hill Defendants cannot provide an exceedingly persuasive justification for unequal treatment of students and parents whose religious beliefs are contrary to the policy's definition of gender.    (*Id.* pp. 9, 10.)

Counts Two, Three, and Four claim violation of free speech and freedom of religion under the First Amendments of the United States and New Jersey Constitutions.    (*Id.* pp. 10–22.)    The policy favors speech based on views and ideas, according to Maldonado, and burdens parents' and students' free-speech rights by requiring affirmance of its definition of gender.    (*Id.* pp. 11, 12.)    The intervenor complaint adds that the policy violates students' and parents'

6

freedom to hold sincerely held Christian beliefs premised on a biblical worldview by forcing them to affirm that there are more than two genders or that gender may be based on one's identity.  (*Id.* pp. 13–16.)  The policy seeks to compel affirmation of views repugnant to Christian beliefs and its stated goals may be achieved without forcing parents and students to alter or otherwise abandon their religious beliefs.  (*Id.* pp. 17, 18.)  The policy does not provide for an excusal or opt-out, stressing one moral interpretation over others, favoring a secular view over a religious one, and discarding other views on gender identity as prohibited, worthy of ridicule, bigoted, or the like.  (*Id.* p. 20.)  Count Four alleges failure to accommodate religious beliefs and practices.  (*Id.* pp. 21, 22.)

Finally, Count Five alleges violation of the New Jersey Law Against Discrimination (NJLAD).  (*Id.* pp. 22–25.) [8]  Maldonado seeks an order declaring the policy unconstitutional and violative of the NJLAD or, in the alternatives, requirements that the policy provide an opt-out for sincerely held religious beliefs or that vouchers be provided for students to attend private schools.  (*Id.* p. 26.)

Shortly after Maldonado filed the intervenor complaint, this case was reassigned to me.  (ECF No. 49.)  After my review of the procedural history of the case, I administratively terminated Cherry Hill and Cranford Defendants' then-pending motions to dismiss the amended complaint and scheduled a

---

[8] Count Five alleges that the Cherry Hill policy violates the NJLAD and fails to offer any accommodation to Maldonado.  (Intervenor Compl. p. 25.)  However, at least part of this claim appears premised on the notion that transgender students are not entitled to NJLAD protections to the extent provided in the policy.  (*See id.* at 24 ("A student's right to be 'transgendered' is entitled to full protection under NJLAD without any medical diagnosis or treatment.  Such action and interpretation of the NJLAD contradict decades of law and precedent."); *see also id.* at 25 ("Requiring an individual to undergo a medical diagnosis and treatment for gender dysphoria provides a very 'workable' justification for providing transgendered individuals protections under the NJLAD.").)

hearing.    (ECF No. 58.)    In response to Cherry Hill and Cranford Defendants' letters stating that leave to file motions to dismiss had been granted, I concluded that Rule 12(b) did not provide discretion to permit post-answer motions to dismiss.    (May 15, 2024 Order.)    I differentiated a Rule 12(b) motion to dismiss from a Rule 12(c) motion for judgment on the pleadings.    (*Id.*) I further granted Cherry Hill and Cranford Defendants leave to file dispositive motions following a hearing held on June 17, 2024.    (June 17, 2024 Order.)

The pending motion practice followed.    After the pending motions were filed, but before they were fully briefed, I ruled on the motions to dismiss filed by State Defendants relating to the Guidance.    I concluded that Short, Costello, and Maldonado each failed to satisfy Article III standing against State Defendants and dismissed their related claims without prejudice.    *Short*, 2024 WL 3424729, at *5–12.

## III.  STANDARDS

Prior to the filing of a responsive pleading, a defendant may move to dismiss a complaint for lack of subject-matter jurisdiction for failure to state a claim upon which relief can be granted.    *See* Fed. R. Civ. P. 12(b)(1), (6).    To survive dismissal under Rule 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" *Doe v. Princeton Univ.*, 30 F.4th 335, 341 (3d Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)), and—accepting the plaintiff's factual assertions, but not legal conclusions, as true—"'plausibly suggest[]' facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged,'" *id.* at 342 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).    Courts further evaluate the sufficiency of a complaint by "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of

the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Subject-matter jurisdiction may be attacked facially or factually through a motion to dismiss pursuant to Rule 12(b)(1). *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A factual attack challenges the allegations underlying the complaint's assertion of jurisdiction and permits the court to consider and weigh evidence outside of the pleadings without presuming the truthfulness of the allegations. *Id.* A facial attack challenges jurisdiction without contesting the factual allegations and, similar to a Rule 12(b)(6) motion, requires the court to consider the complaint's allegations as true. *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1174 n.7 (3d Cir. 2024).

Motions to dismiss "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). However, a motion for judgment on the pleadings may be filed "[a]fter the pleadings are closed—but early enough not to delay trial …." Fed. R. Civ. P. 12(c).

Despite the distinct times in which to file the motions, the same standards apply. *See Jenkins v. SEPTA*, 801 F. App'x 71, 72 (3d Cir. 2020) (noting that the standards governing Rule 12(c) motions are the same as those that govern Rule 12(b)(6) motions); *Itiowe v. Robert Wood Johnson Univ. Hosp. Hamilton*, 556 F. App'x 124, 125 (3d Cir. 2014) (finding that the district court ought to have treated the answering defendants' motions to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) as motions for judgment on the pleadings, but that the same standard applied). Courts must accept the nonmovant's allegations in the pleadings as true and draw all reasonable inferences in their favor. *Bibbs v. Trans Union LLC*, 43 F.4th 331, 339 (3d Cir. 2022). "A plaintiff can survive a Rule 12(c) motion if her complaint contains 'sufficient factual matter to show that the claim is facially plausible, thus enabling the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'"

9

*Id.* (alteration in original) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)).

## IV.  DISCUSSION

As should come as no surprise following the June 2024 hearing, my opinion in response to State Defendants' motions to dismiss, and the pending briefing, my analysis will begin—and in some cases end—on the issue of standing.    This is because standing is jurisdictional.    *See Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).   "Standing is a 'fundamental jurisdictional question;' therefore, 'challenges to standing must be addressed before reaching the merits.'"    *Pipito v. Lower Bucks Cnty. Joint Mun. Auth.*, 822 F. App'x 161, 165 (3d Cir. 2020) (quoting *AT&T Commc'ns of N.J., Inc. v. Verizon N.J., Inc.*, 270 F.3d 162, 168 (3d Cir. 2001)).

Article III of the United States Constitution limits federal courts' jurisdiction to cases and controversies, which may exist only if the plaintiff has standing to sue.    *Reading v. N. Hanover Twp.*, 124 F.4th 189, 196 (3d Cir. 2024).   "At the pleading stage, to have Article III standing, a litigant invoking the power of a federal court must plausibly allege (i) an injury-in-fact (ii) that is fairly traceable to the conduct of the party sued, and (iii) that is judicially redressable."    *Lutter v. JNESO*, 86 F.4th 111, 124 (3d Cir. 2023).   Similarly, standing for injunctive relief requires a plaintiff to show that 1) they are under threat of suffering an injury-in-fact that is concrete and particularized, 2) the threat is actual and imminent as opposed to conjectural or hypothetical, 3) the threat is fairly traceable to the challenged action of the defendant, and 4) a favorable judicial decision will likely prevent or redress the injury.    *Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 165 (3d Cir. 2016).

A plaintiff must establish standing for each form of relief they seek.    *Yaw v. Del. River Basin Comm'n*, 49 F.4th 302, 317 (3d Cir. 2022).   Standing for retrospective relief in the form of monetary damages may be established by

evidence of a past injury. *Id.* at 317–18. Importantly, however, "when a plaintiff seeks *prospective* (forward-looking) relief in the form of an injunction or a declaratory judgment, they must show that they are 'likely to suffer *future* injury.' The future injury must also be 'imminent,' meaning that it is 'certainly impending' rather than just merely 'possible.'" *Id.* at 318 (footnote omitted) (quoting *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

With these principles in mind, I consider the plaintiffs' claims in turn.

### A.  Maldonado

I did not reach the merits of Maldonado's claims in ruling on State Defendants' motions to dismiss. Rather, I concluded that the plain meanings of "school" and "school district" referred to institutions and government entities and thus directives providing that school districts honor and accept students' asserted gender identities did not apply to her or her children. *Short*, 2024 WL 3424729, at *9–10. I concluded that "whoever or whatever is advised to honor, recognize, and accept a student's gender identity and whatever effects that may have on that individual or entity, Maldonado is not among them." *Id.* at *11.

Flashing forward to the pending motion practice, Maldonado does not dispute the authorities cited in my opinion concerning the plain meanings of "school" and "school district," but rather seeks to distinguish those cases as not involving school-board policies. (ECF No. 85 (Intervenor Opp'n Br.) p.20.) She cites a recent Ninth Circuit opinion for the proposition that I "must accept [her] alleged fact that [the Cherry Hill policy] applies to students and families in the Cherry Hill School District even if 'actual proof' of this assertion is 'impro[b]able.'" (*Id.* p.19 (quoting *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 722 (9th Cir. 2024), *vacated*, 127 F.4th 750 (9th Cir. 2025)).) Maldonado questions the efficacy of the Cherry Hill policy absent its application to students and families. (*Id.* pp.20, 21.) Further support for the policy's

application to her and her children can be found by placing it in context with other policies in its section of the Cherry Hill policy manual and policies pertaining to racism and harassment, intimidation, and bullying.  (*Id.* pp. 21, 22.)

For their part, Cherry Hill Defendants maintain that nothing in the policy dictates what views students or parents must hold or express on gender issues and claim that no facts are alleged that Maldonado or her children will ever be required to hold or express views contrary to their religious beliefs.  (ECF No. 79–3 (Cherry Hill Defs.' Intervenor Mot. Br.) pp. 10, 11.)  Maldonado merely advances a personal interpretation of the policy rather than any disputed fact, according to Cherry Hill Defendants.  (ECF No. 87 (Cherry Hill Defs.' Intervenor Reply Br.) pp. 7, 8.)

Similar to the Guidance from which it was adopted, the Cherry Hill policy contains directives including "[a] student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected *by the school district, school, or school staff members*," "*[t]he school district* shall honor and recognize a student's asserted gender identity, and shall not require any documentation or evidence in any form, including diagnosis, treatment, or legal name change," and "[t]o ensure consistency among *teachers, school administrators, substitute teachers, and other school staff members*, every effort should be made to immediately update student education records …." (ECF No. 85–2 (Intervenor Ex. A.) pp. 1–3 (emphasis added).)  Elsewhere, the policy directs the superintendent or their designee to "ensure training is provided to *school staff members* on sensitivity and respect towards transgender students."  (*Id.* p. 2 (emphasis added).)

My review of the Cherry Hill policy leads me to the same conclusion as my analysis of the Guidance: that its directives apply to the district, its schools, and related administrators and staff.  Schools and school districts logically refer to

institutions and local government entities, respectively.  *See N.J. Carpenters Apprentice Training and Educ. Fund v. Borough of Kenilworth*, 685 A.2d 1309, 1313 (N.J. 1996) ("'School,' as ordinarily used, has two meanings: a broad one, including all institutions of learning, or a more narrow one, including only primary and secondary schools."); *N.J. Ass'n of Sch. Bus. Offs. v. Davy*, 978 A.2d 295, 305 (N.J. Super. Ct. App. Div. 2009) ("This court has recognized that a school district is a local governmental unit governed by the school district's board of education.").

Maldonado does not challenge these definitions in the cases cited, but rather seeks to distinguish them as they did not involve "school district" or "school" in the context of a policy pertaining to individual conduct.  (Intervenor Opp'n Br. p.20.)  She cites no authority—and I am able to find none—that supports the proposition that the interpretation of a school district policy requires use of terms' nontraditional meanings.  Nor does she cite competing authorities in which "school" and "school district" were interpreted as encompassing students and their families.  Logic therefore dictates that— absent some differentiating language—the terms in the Cherry Hill policy are to be assigned their plain and ordinary meanings.  *See Pipito*, 822 F. App'x at 165 (interpreting the plain language of a joint municipal authority memorandum to determine that its strictures on speech were limited to the workplace).

Maldonado asserts that, without applying the Cherry Hill policy's directives to students and families, the policy cannot meet its stated goals of ensuring supportive and nondiscriminatory environments for transgender students, facilitating familial acceptance and support of students' transgender statuses, ensuring nondiscrimination in the face of objections and concerns, and the like. (Intervenor Opp'n Br. pp.20, 21.)  This argument may offer a compelling rebuke to the drafting of the policy and whether it is capable of

13

meeting its intended goals.    However, my task is to interpret its plain meaning, not weigh in on its efficacy.    *See Stepien v. Murphy*, 574 F. Supp. 3d 229, 233 (D.N.J. 2021) ("In general, the wisdom of such public policies is not an issue for the courts, but for the people's elected representatives.").

Likewise, and contradicting Maldonado's arguments, the Cherry Hill policy plainly contemplates disagreement from students, parents, and other community members.    For instance, the policy acknowledges that "[t]here may be instances where a parent of a minor student disagrees with the student regarding the name and pronoun to be used at school and in the student's education records." (Intervenor Ex. A. p.1.)    In such instances, school staff are to continue to refer to the student by their preferred name and pronouns and may consider providing information regarding family counseling and support services.    (*Id.*)    The policy also emphasizes schools' obligation to provide transgender students with equal access to programs and activities "even in circumstances in which other students, parents, or community members raise objections or concerns."    (*Id.* p.2.)    This provision would be unnecessary if the policy "require[d] students and families attending Cherry Hill to affirm the [p]olicy's definition of gender."    (Intervenor Opp'n Br. p.7.) Such examples come directly from the text of the policy rather than hypotheticals.

Maldonado next invites me to decipher the policy's meaning from its placement in the "Students" section of the Cherry Hill policy manual as opposed to "Administration," "Teaching Staff Members," or "Support Staff Members" sections.    (*Id.* p.21.)    Only speculation supports the assertion that the policy manual is organized by mandated individual conduct.    Under the same logic, other policies within the "Students" section including Automated External Defibrillators, Health Services Personnel, Health Services to Nonpublic

14

Schools, and Nursing Services Plan would similarly be "dedicated to student behaviors." (*Id.*, ECF No. 85–4 (Intervenor Ex. C).)

Citation to Cherry Hill's Anti-Racism and Harassment, Intimidation, and Bullying policies are similarly unhelpful. Contrary to Maldonado's general argument, the Anti-Racism policy does not appear in the "Students" section of the policy manual. (Intervenor Ex. C, ECF No. 85–5.) Furthermore, the argument ignores the differences between what a school may require of its employees as compared to what it may require of its students. *See Melynk v. Teaneck Bd. of Educ.*, Case No. 16–00188, 2016 WL 6892077, at *3 (D.N.J. Nov. 22, 2016) ("In a public school context, courts must balance 'the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968))); *see also Ambrose v. Del. State Univ.*, Case No. 21–00416, 2021 WL 3568373, at *5 n.68 (D. Del. Aug. 12, 2021) ("Public employees are subject to a different standard than public school students.").

The Harassment, Intimidation, and Bullying policy does reside in the "Students" section of the policy manual, but Maldonado's reference to it is also somewhat perplexing. (*See* Intervenor Opp'n Br. pp.22, 23 ("assert[ing] that acceptance of [the Cherry Hill policy's] definition of 'gender' is mandated as a necessary part of that 'safe and nondiscriminatory environment' that must be provided" when read alongside the Harassment, Intimidation, and Bullying policy).) I presume that Maldonado does not mean to convey that she or her children intend to engage in harassment, intimidation, or bullying or assert a right to engage in such speech or conduct. She confirms as much in her intervenor complaint. (Intervenor Compl. p.16 ("[I]n opposing the Guidance and Policy, Intervenor/Plaintiff is NOT asserting that students and parents have the right to engage in discriminatory conduct.").)

School districts in New Jersey are required to adopt policies "prohibiting harassment, intimidation or bullying on school property, at a school-sponsored function or on a school bus." N.J. Stat. Ann §18A:37–15(a). Harassment, intimidation, or bullying encompasses gestures; written, verbal, or physical acts; and electronic communications that are "reasonably perceived as being motivated either by any actual or perceived characteristic, such as … gender identity and expression … that substantially disrupts or interferes with the orderly operation of the school or the rights of other students …." N.J. Stat. Ann §18A:37–14. Such activities constitute harassment, intimidation, or bullying if a reasonable person should know that they will physically or emotionally harm a student, damage their property, or place a student in reasonable fear of physical or emotional harm or damage to their property; they have the effect of insulting or demeaning a student or group of students; or if they create a hostile educational environment. *Id.* In other words, Cherry Hill Defendants' obligation to prohibit harassment, intimidation, and bullying based on a student's gender identity exists separate and apart from the challenged policy. Such prohibitions in and of themselves do not violate First Amendment rights. *See Dunkley v. Bd. of Educ. of the Greater Egg Harbor Reg'l High Sch. Dist.*, 216 F. Supp. 3d 485, 490 (D.N.J. 2016) ("[T]he Court cannot find that defendants violated plaintiff's rights under the New Jersey or federal constitutions to free speech because plaintiff's speech was of the type the school was permitted to—and indeed required to—restrict.").

This leaves me with two recent out-of-circuit decisions that Maldonado asserts are "factually strikingly similar" to the case at bar. (Intervenor Opp'n Br. p.7.) The first, *Parents Defending Education v. Linn Mar Community School District*, involved a school-district regulation intended to address the needs of transgender, gender-expansive, non-binary, and gender non-conforming students. 83 F.4th 658, 663 (8th Cir. 2023). The plaintiff was an

16

association of parents.  *Id.*  The regulation included a provision stating that an "'intentional and/or persistent refusal by staff or students to respect a student's gender identity is a violation of school board policies,' including 'anti-bullying' and 'anti-harassment' policies ….   A student who violates the policy 'shall be disciplined by appropriate measures, which may include suspension and expulsion.'"  *Id.* at 664.  The plaintiff filed suit and moved for a preliminary injunction—which was denied, in part, for lack of standing.   *Id.* at 664–65.

The Eighth Circuit vacated the district court's orders, concluding that at least one parent alleged an injury.  *Id.* at 666, 669.  That parent alleged that her son wished to 1) state that biological sex is immutable, 2) disagree with another student's assertion of whether they are male or female, 3) state that a biological male who identifies as female should not compete in female sports, and 4) express discomfort with sharing a restroom with teachers and students of the opposite sex.  *Id.* at 666.  The student allegedly desired to engage in an open exchange of ideas, but remained silent on gender topics in order to avoid violating the regulation.  *Id.* at 666–67.  The court determined that "respect" in the regulation was not limited to use of preferred names and pronouns and a credible threat of enforcement existed as the text of the policy itself referred to discipline, including suspension and expulsion.   *Id.* at 667.

This is not Maldonado's case or the Cherry Hill policy.  The intervenor complaint does not provide specifics as to the speech or conduct Maldonado or her children wish to engage in that is allegedly proscribed by the policy.  In fact, much of the intervenor complaint is dedicated to alleged compelled speech in the form of affirmance of the policy's definition of gender that is itself unsupported by the text of the policy.  Most significantly, the regulation in *Parents Defending Education* contained express requirements for student

behavior and consequences for noncompliance. *Id.* at 664. Such language is absent from the Cherry Hill policy.

The resolution in *Updike v. Jonas* is, admittedly, more on point in that the relevant provisions did not refer to student conduct directly. *See* 700 F. Supp. 3d 597, 599–600 (S.D. Ohio 2023). Instead, the resolution—which stated that the district would not include Critical Race Theory, anti-racism curriculum, and the like in student education or staff training—referred to schools, instructors, and guest speakers and prohibited certain activities and assignments. *Id.* Unlike the present case, though, the plaintiffs included teachers and the court determined that the resolution set forth prohibited actions teachers could not take. *Id.* at 599, 602. The plaintiffs further alleged that the defendants were actively enforcing the resolution. *Id.* at 603.

Maldonado is correct that, at the pleading stage, her factual assertions are entitled to acceptance. However, analogous matters of statutory interpretation are questions of law as opposed to fact. *See LD Gelato LLC v. Hartford Underwriters Ins. Co., Inc.*, 676 F. Supp. 3d 317, 323 n.7 (D.N.J. 2023). Further, any deference Maldonado may be afforded does not relieve her of her obligation to plausibly assert standing. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016) ("[T]o survive a motion to dismiss for lack of standing, a plaintiff 'must allege facts that affirmatively and plausibly suggest that it has standing to sue.'" (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011))).

I conclude that her interpretation of the Cherry Hill policy, which she appears to acknowledge is "impro[b]able" (Intervenor Opp'n Br. p.19), does not meet that threshold. The plain language of the policy, context provided by Maldonado, and analogous cases cited all lead me to the conclusion that the policy does not apply to her or her children and she therefore fails to plead an injury-in-fact or threat of suffering an injury-in-fact. *See Pipito*, 822 F. App'x

at 165 (determining, based on the memorandum's plain language, that its restrictions applied only to the workplace and the plaintiff did not demonstrate a reason to believe that he faced credible threat of punishment for protected speech outside of the workplace); *Collura v. Maguire*, 569 F. App'x 114, 118 (3d Cir. 2014) (discussing a challenge to the confidentiality provisions of the Pennsylvania Rules of Disciplinary Enforcement and noting that the plaintiff did not allege a specific instance in which he was or would be precluded from disclosure, he publicized his complaint via the lawsuit after which he was not sanctioned, and the rules did not provide for sanctions).

Cherry Hill Defendants do not attempt to argue otherwise.   Maldonado claims that Cherry Hill Defendants have refused to disavow enforcement against individuals who wish to disagree with the policy's definition of gender. (Intervenor Opp'n Br. p.17.)   This ignores the clear position of Cherry Hill Defendants that the policy does not require her or her children to adopt any definition or belief concerning gender.   (*See* Cherry Hill Defs.' Intervenor Mot. Br. p.10 ("[N]othing in the Guidance or Cherry Hill policy dictates what views parents or other students must hold or express on gender issues."), Cherry Hill Defs.' Intervenor Reply Br. p.8 ("Since the provisions of the Cherry Hill policy are not being applied to her or her children, her injuries are, as the Court put it, 'perceived rather than actual.'")); *see also Greenberg v. Lehocky*, 81 F.4th 376, 386 (3d Cir. 2023) (noting that the defendants disavowed enforcement against the plaintiff's planned conduct).   I accepted a similar representation from State Defendants in my earlier opinion.   *See Short*, 2024 WL 3424729, at *10.

The Cherry Hill policy implicates complex, sensitive issues that students will no doubt take from the classroom to the dinner table.   Ensuing thoughts and conversations may touch upon family, faith, sexuality, and a host of other important topics. I accept Maldonado's stated concerns as genuine expressions of her faith and related beliefs.   However, without the allegedly

offending provisions applying to her or her children, her mere perception of harm is insufficient to confer standing.   *See Greenberg*, 81 F.4th at 388 ("[A] plaintiff 'cannot manufacture standing merely by inflicting harm on [himself] based on [his] fears of hypothetical future harm that is not certainly impending.'" (alterations in original) (quoting *Clapper*, 568 U.S. at 416)); *Woodend v. Lenape Reg'l High Sch. Dist.*, 535 F. App'x 164, 167 (3d Cir. 2013) ("Because Woodend has pled only conjectural harms to his rights to speak, assemble, and associate, he has no standing to raise these claims and we will not address them.").   I will therefore grant Cherry Hill Defendants' dismissal motion.[9]

### B.   Short

Short asserts that he and his three children are forced to participate in the Cherry Hill policy and that he is deliberately excluded from conversations about his children's gender identity.   (Am. Compl. p.4.)   His children may—at any time—adopt new gender identities, representing a continual interference with his constitutional rights.   (*Id.*)   He contends that he would not become aware of his children's gender-identity changes due to the policy's confidentiality requirement and that he ought not to have to wait an indeterminate amount of time for that to occur as his rights are currently being impinged.   (*Id.* p.27.)

As was the case in my decision on the State Defendants' motions, I find that the most useful starting point in analyzing Short's standing is the Fourth Circuit's recent decision in *John and Jane Parents 1*.   There, the county board of education adopted guidelines that permitted schools to develop gender-

---

[9] The Third Circuit concluded its analysis in *Greenberg* by noting that the rule had only recently been enacted, its effects had not yet been felt, and if the plaintiff's fears were later validated he would be able to file a new lawsuit to vindicate his rights. 81 F.4th at 389.   The Cherry Hill policy is not quite as new as the rule in *Greenberg*, but the same principle applies here.   My conclusion that Maldonado lacks standing does not foreclose her from vindicating her rights in the future should the perception of harm I find here blossom into an injury or threat of injury.

support plans for students. *John and Jane Parents 1*, 78 F.4th at 626. The guidelines provided that—prior to contacting a student's parent or guardian—the school principal or a staff member was to speak with the student to ascertain the familial level of support and could withhold information if the family was unsupportive. *Id.* at 627. Three parents filed suit, claiming that the so-called "Parental Preclusion Policy" permitted schools to develop gender-support plans without parental involvement and withhold information from parents and guardians. *Id.*

The complaint was dismissed on the merits by the district court and the issue of Article III standing was raised for the first time on appeal. *Id.* at 627–28. The Fourth Circuit concluded that the plaintiffs did not present a current injury because they did not allege that any of their children had a gender-support plan or discussed gender-identity or transition issues with school officials. *Id.* at 629. The parents also failed to allege a certainly impending injury or substantial risk of future injury because they did not allege that they suspected that their children might consider a gender transition or were at heightened risk of doing so. *Id.* at 630. Rather, the plaintiffs sustaining a future injury required 1) their children to determine that they identified as transgender or gender-nonconforming, 2) their children to decide to approach school officials about gender-support plans, 3) the school to conclude that the plaintiffs were unsupportive, and 4) the school to decide to keep information about their children from the plaintiffs. *Id.* at 631. This chain of events required guesswork as to the future actions of both the plaintiffs' children and school officials. *Id.*

The reasoning of *John and Jane Parents 1* has already been adopted within this Circuit. *See Doe v. Pine-Richland Sch. Dist.*, Case No. 24–00051, 2024 WL 2058437, at *5–6 (W.D. Pa. May 7, 2024). At issue in *Doe* was a school district policy that included provisions regarding privacy and

confidentiality.  *Id.* at *2–3.  District personnel were not to disclose a student's transgender status to others—including parents and guardians—unless legally required to do so or if the student authorized such disclosure. *Id.* at *2.  The policy noted that parents and guardians are generally aware of students' transitions and thus notification may be unnecessary and, in other cases, notification may place students at risk.  *Id.*  The plaintiff alleged that she was concerned about her child transitioning due to their viewing of videos related to sexuality and transitioning and the fact that the child's friend group included children who identified as transgender or who were socially transitioning.  *Id.* at *3.  Her requests to be notified if her child exhibited any gender-identity issues were denied by the school district.  *Id.*

Ruling on the plaintiff's motion for a preliminary injunction, the court found that the plaintiff could not satisfy the likelihood-of-success-on-the-merits and irreparable-harm prongs because she lacked the injury required to confer standing.  *Id.* at *9.  The plaintiff failed to allege that her child identified as transgender, approached the school district about their gender, or that the school district interacted with the child at all concerning gender and she therefore did not present a current or imminent future injury.  *Id.* at *8–9. The court's decision as to standing later supported dismissal of the plaintiff's claims with prejudice.  *See Doe v. Pine-Richland Sch. Dist.*, Case No. 24–00051, 2024 WL 5274669, at *2–3 (W.D. Pa. Dec. 12, 2024); *but see Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.*, Case No. 24–00107, 2024 WL 5006711, at *8 (D.N.J. Nov. 27, 2024) (distinguishing *John and Jane Parents 1*, *Short*, and *Doe* on the issue of standing because the plaintiff alleged 1) a past injury caused by the school referring to his child by their preferred name and pronouns without his knowledge or consent and 2) that the defendants would continue implementing the policy upon his child's return to school).

It appears plain that Short's allegations fall firmly within the ambit of the Fourth Circuit and Western District of Pennsylvania's decisions.   As noted by Cherry Hill Defendants, he does not allege that any of his children have sought any services, information, or treatment from school personnel regarding their gender or that any information is being withheld from him.   (ECF No. 78–3 p. 13.)   Like the parents in *John and Jane Parents 1*, whether Short will ever sustain an injury depends on whether 1) one of his children identifies as transgender or gender-nonconforming, 2) the child decides to approach school officials about their gender identity, and 3) Short does not learn of the child's gender identity through either his child or the school disclosing the child's status for an excepted reason.   *See* 78 F.4th at 631.   This chain of events depends on the unknowable future actions of Short's children and school personnel.   *See id.*; *see also Clapper*, 568 U.S. at 413 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."); *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 152 (3d Cir. 2023) ("[S]tanding cannot be based on speculative injury.").   At best, Short alleges that "[a]t any time, his child or children can adopt a new gender identity, without his knowledge or consent."   (Am. Compl. p. 4.)   This allegation mirrors the "for all they know" argument that the Fourth Circuit concluded was insufficient to establish an injury.   *See John and Jane Parents 1*, 78 F.4th at 630 (cleaned up).

Short responds by seeking to differentiate his allegations from those discussed at the district level in *John and Jane Parents 1*.   (ECF No. 82 pp. 6, 7.)   The plaintiffs in *John and Jane Parents 1* never alleged an impingement of their right to direct the medical care of their children, according to Short. (*Id.* p. 6.)   He further argues that Cherry Hill Defendants, and presumably this Court, have mischaracterized his alleged injury as a potential future one rather than an ongoing one—quoting liberally from his opposition to State Defendants'

motion to dismiss discussing *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007).   (*Id.* pp. 6–10.)

The school district in *Parents Involved* adopted a school-assignment policy based on student preference wherein the racial composition of the school and race of the student were a tiebreaker for selection into an oversubscribed school. 551 U.S. at 711–12.   The policy sought to achieve a specific "balance" range of white and nonwhite students.   *Id.* at 712.   The petitioner was a nonprofit corporation of parents whose children were or could have been denied assignment to their preferred school due to race.   *Id.* at 713.   In response to the defendant's threshold standing challenge, the Court concluded that the fact that members' children might not be denied admission to a particular school did not negate the injury alleged and that being forced to compete in a race-based system was itself an equal-protection injury.   *Id.* at 718–19.

Persuasively, the majority in *John and Jane Parents 1* responded to the dissent's invocation of *Parents Involved* by noting that nothing in *Parents Involved* or subsequent Supreme Court decisions indicate that its standing standard applies outside the context of equal-protection claims.   78 F.4th at 634.   Rather, standing in *Parents Involved* "hinge[d] on the fact that the Supreme Court has repeatedly held, in equal protection cases, that being 'forced to compete in a race-based system' is sufficient for Article III standing."   *Id.* (quoting *Parents Involved*, 551 U.S. at 719).   Furthermore, in my decision granting State Defendants' motions to dismiss, I distinguished Short from the petitioner in *Parents Involved* as more contingencies separate Short from a sufficiently imminent injury.   *Short*, 2024 WL 3424729, at *6–7; *see also Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 657 F. Supp. 3d 1161, 1172 (W.D. Wis. 2023) (distinguishing the district's transgender guidance from *Parents Involved* as the guidance, unlike the school-assignment policy in *Parents Involved*, would not be applied to most children and whether

children would seek assistance under the guidance without parental knowledge was conjectural).   Time and renewed arguments have not swayed me from that conclusion.

Insofar as Short seeks to differentiate his claims from those of the parents in *John and Jane Parents 1* based on his allegation that the Cherry Hill policy usurps his role in directing his children's medical care, he provides no support for the proposition that such an allegation requires a distinct standing analysis. Presuming that this argument is for more than the sake of distinction, I conclude that it, too, must fail.

The plaintiff in *Parents Protecting Our Children* was a nonprofit association of parents that challenged the school district's guidance pertaining to transgender, non-binary, and gender-nonconforming students.   657 F. Supp. 3d at 1164–65.   The guidance acknowledged that some students were not open at home and did not require parental notification, but related gender-support plans were available to parents upon request.   *Id.* at 1166–67.   The plaintiff alleged, similar to Short, that the district was "providing 'psychosocial medical/psychological care through transgender social transition' for which it [wa]s intentionally not obtaining parental consent." *Id.* at 1169. Nevertheless, on the issue of standing, the court found—similar to *John and Jane Parents 1*—that none of the plaintiff's members alleged that any of their children were transgender or gender nonconforming, the district applied the guidance or a gender-support plan to any child let alone a member's child, or any parent or guardian had been denied information about their child's gender identity.   *See id.* at 1169–70.   Rather, the plaintiff's standing argument was premised on a speculative chain of possibilities involving the future choices of unidentified individuals insufficient for standing.   *Id.* at 1171.

The Seventh Circuit affirmed.   *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 507 (7th Cir. 2024) *cert. denied*, 145 S. Ct.

14 (2024).   The Seventh Circuit held that the plaintiff's worry and concern failed to demonstrate any actual or imminent injury attributable to the guidance or a gender-support plan.   *Id.* at 506.

The same principle holds true here.   Because I remain convinced that *John and Jane Parents 1* is directly on point and am unpersuaded by Short's efforts to distinguish that case from his own, I conclude that he lacks standing to assert his claims and Cherry Hill Defendants' motion must be granted.

### C.    Costello

#### 1.    Declaratory Relief

The standing analysis with respect to Costello requires more nuance. Costello clarifies that she is not seeking injunctive relief, but rather a declaratory judgment that her constitutional rights were violated.   (ECF No. 81 (Costello Opp'n Br.) p.9.)   Such a declaration is warranted, she says, because her request for declaratory relief is closely intertwined with her claim for monetary damages.   (*Id.*)   Cranford Defendants maintain that because Costello has removed her child from school without intention of reenrollment, its policy no longer applies to her and she lacks standing to seek declaratory relief.   (ECF No. 76 pp.25, 26, ECF No. 90 pp.9–11.)   I agree with Cranford Defendants.

Costello supports her position with out-of-circuit decisions.   (Costello Opp'n Br. p.10.)   For instance, in *Crue v. Aiken*, a group of University of Illinois faculty members and a graduate teaching assistant sought to contact athletic recruits about the controversy surrounding the school mascot and interpreted statements by the chancellor as prior restraints on their speech.   370 F.3d 668, 674–77 (7th Cir. 2004).   Discussing the issue of mootness, the Seventh Circuit recognized that "[w]hen a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive."   *Id.* at 677.   Costello also cites *Lippoldt v. Cole*, which pertained

to the denial of parade permits.   468 F.3d 1204, 1210–11 (10th Cir. 2006). The Tenth Circuit stated that declaratory relief is treated as retrospective "to the extent that it is intertwined with a claim for monetary damages that requires us to declare whether a past constitutional violation occurred."   *Id.* at 1217 (quoting *PETA v. Rasmussen*, 298 F.3d 1198, 1202 n.2 (10th Cir. 2002)). Further, claims for declaratory relief are not moot when a court must determine whether a past constitutional violation occurred that will affect parties' current rights or future behavior.   *Id.*

As a threshold matter, to the extent that the cited cases refer to mootness, "[s]tanding and mootness are two distinct justiciability doctrines …."   *Freedom from Religion Found. Inc v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 475 (3d Cir. 2016).   "Standing ensures that each plaintiff has '[t]he requisite personal interest ... at the commencement of the litigation,' while mootness ensures that this interest 'continue[s] throughout' the duration of the case." *Id.* at 476 (alterations and omission in original) (quoting *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)).

More to the point, even if *Crue* and *Lippoldt* provided persuasive value, I am tasked first and foremost with applying the law of this Circuit.   The Third Circuit has unambiguously provided that "[s]tanding to seek a declaratory judgment exists when 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"   *Ke v. DiPasquale*, 828 F. App'x 98, 101 (3d Cir. 2020) (quotation marks omitted) (quoting *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. V.I.*, 218 F.3d 232, 240 (3d Cir. 2000)).   "Issuance of a declaratory judgment or an injunction *requires a threat of future harm*."   *Id.* (emphasis added); *see also Lutter*, 86 F.4th at 129 (discussing the redressability requirement of standing and stating that a declaratory judgment "must provide something other than the 'emotional

27

satisfaction' of a favorable ruling," but rather "provide conclusive resolution of a concrete controversy related to a prospective course of action by one of the adverse parties" (quoting *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977))); *Yaw*, 49 F.4th at 318 (3d Cir. 2022) ("[W]hen a plaintiff seeks *prospective* (forward-looking) relief in the form of an injunction or a declaratory judgment, they must show that they are 'likely to suffer *future* injury.'") (quoting *McNair*, 672 F.3d at 223)); *Doe*, 2024 WL 5274669, at *2 (noting that the only material factual change in the second amended complaint was that the plaintiff removed her child from the school district, which strengthened the court's earlier determination that the plaintiff could not demonstrate an actual or immediate future injury).

Costello's request for declaratory relief is unambiguously retrospective. (Costello Opp'n Br. p.9 ("[A] declaratory judgement that Costello's constitutional rights *were* violated is requested. And because Costello's request for declaratory relief is closely intertwined with a claim for monetary damages, a declaration on whether a *past constitutional violation occurred* is warranted.") (emphasis added)). The amended complaint makes clear that she does not intend to reenroll her child in Cranford Public Schools. (Am. Compl. p.40 (seeking an order directing Cranford Defendants to reimburse Costello for tuition expenses for eighth to tenth grades "in addition to future expenses for the remainder of the child's High School Education").)

In these respects, Costello's pursuit of declaratory relief is analogous to the recent decision in *Borowski v. Kean University*, Case No. 20–05172, 2025 WL 274618 (D.N.J. Jan. 23, 2025). There, the plaintiff was a former adjunct professor who was removed from a class after concerns raised by students. *Borowski*, 2025 WL 274618, at *1. She was later notified by the university that her teaching contract was not being renewed and that her remarks in class violated the New Jersey State Policy Prohibiting Discrimination in the

Workplace. *Id.* The plaintiff sought a declaration that the policy was unconstitutional and unenforceable, but the court determined that the amended complaint failed to plead that the plaintiff was likely to suffer a future injury that could be redressed by declaratory relief. *Id.* at *3. The plaintiff's injury was that her contract was not renewed and there was no allegation that she remained subject to the policy. *Id.* She therefore lacked standing because prospective relief could not remedy her alleged past harm. *Id.*

The same holds true here. A declaration that Costello's constitutional rights were violated by the Cranford policy would not redress any alleged future injury because Costello does not plead that she or her child are subject to the policy or will be ever again. *See id.* (noting that in order for a declaratory judgment to redress an injury-in-fact "it must provide something other than the 'emotional satisfaction' of a favorable ruling" (quoting *Lutter*, 86 F.4th at 129)). Because Costello fails to identify a future injury that would be redressed by the sought-after declaratory relief, I conclude that she lacks standing and Cranford Defendants' motion as to declaratory relief will be granted on that basis. *See Yaw*, 49 F.4th at 317 (noting that a plaintiff must demonstrate standing for each form of relief they seek).

## 2.  **Monetary Damages**

Costello's request for monetary damages in the form of reimbursement for tuition costs is a horse of a different color. A plaintiff may seek retrospective monetary relief by demonstrating a past injury. *Id.* at 317–18.

To state a Section 1983 claim, a plaintiff must allege violation of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed by a person acting under color of state law. *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). The Fourteenth Amendment of the United States Constitution provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Amend. XIV.

Costello alleges violation of her substantive due process right to direct the upbringing, care, and healthcare decisions of her child. (Am. Compl. pp. 28–33.) "Substantive due process 'limits what [the] government may do regardless of the fairness of [the] procedures that it employs,' to 'guarantee protect[ion] against government power arbitrarily and oppressively exercised.'" *Holland v. Rosen*, 895 F.3d 272, 292 (3d Cir. 2018) (cleaned up) (alterations in original) (quoting *Steele v. Cicchi*, 855 F.3d 494, 501 (3d Cir. 2017)). If the identified right is fundamental, "its infringement must be 'narrowly tailored to serve a compelling state interest.'" *Id.* at 293 (quoting *Chavez v. Martinez*, 538 U.S. 760, 775 (2003)). If a fundamental right is not implicated or infringed, only a legitimate state interest rationally served by the law is required. *Id.*; *see also Am. Express Travel Related Servs. Co., Inc. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 574 (D.N.J. 2010) ("Typically, 'a legislative act will withstand substantive due process challenge if the government "identifies a legitimate state interest that the legislature could rationally conclude was served by the statute," although legislative acts that burden certain "fundamental" rights may be subject to stricter scrutiny.'" (quoting *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 140 (3d Cir. 2000))). For a right to be fundamental, "it must be 'deeply rooted in this Nation's history and tradition,' or 'implicit in the concept of ordered liberty.'" *Holland*, 895 F.3d at 293 (quoting *Lutz v. City of York*, 899 F.2d 255, 267 (3d Cir. 1990)). Courts must refrain from reading this definition too broadly and thereby expanding the concept of substantive due process. *Id.*

Due process "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children," but this interest is not absolute. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 933 (3d Cir. 2011) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). To trace the boundaries of this right, I turn first to the Third Circuit's decision in *Anspach ex rel. Anspach v. City of Philadelphia, Department of Public Health*, 503 F.3d 256 (3d Cir. 2007), discussed both during the June 2024 hearing and in the parties' pending briefs.

The sixteen-year-old minor in *Anspach* visited a healthcare center operated by the city department of public health fearing that she was pregnant. 503 F.3d at 259. A social worker at the center confirmed that she could be provided with pills that would prevent pregnancy and the minor requested them. *Id.* A nurse took the minor's temperature and blood pressure and provided her with pills with the instruction to take four immediately and four more in 12 hours. *Id.* The minor took four pills in the nurse's presence, but suffered stomach pains and vomiting upon taking the second dose—leading her father to learn that the pills were provided to her. *Id.* at 260. The minor and her parents filed suit, with the parents' Section 1983 claims premised on alleged violation of their constitutional right to provide parental guidance. *Id.*

The Third Circuit affirmed dismissal of the parents' Section 1983 claims, concluding that a due process violation cannot be maintained "when the conduct complained of was devoid of any form of constraint or compulsion." *Id.* at 262–64, 274. There was no coercion on the part of the healthcare center and no one prevented the minor from contacting her parents before taking the pills that she herself requested. *Id.* at 264–65. The parents' actual allegation was not that the healthcare center interfered with their role as parents, according to the court, but rather that it failed to affirmatively foster the parent-child relationship—assistance that they were not entitled to under the Due Process

Clause. *Id.* at 266. The Constitution similarly did not protect the parents' moral or religious sensibilities or guarantee that their child's voluntary actions would comport with those sensibilities. *Id.* at 268. The court observed that a constitutional obligation for state actors to contact parents or encourage minors to contact their parents "would undermine the minor's right to privacy and exceed the scope of the familial liberty interest protected under the Constitution." *Id.* at 262.

At first blush, these principles appear readily applicable to Costello and her child absent some constraint or compulsion not apparent in the amended complaint. Costello seeks to distinguish *Anspach*, first claiming that the Cranford policy is mandatory and that the interference with the parent-child relationship is thus compelled. (Costello Opp'n Br. p.11.) The fact that her child was free to communicate with her "misses the point," Costello claims, because the school encouraged, facilitated, and affirmed her child's change in gender identity. (*Id.* p.15.) Costello also attempts to differentiate the contraceptives at issue in *Anspach* with the gender identity at issue here, with the latter implicating human psychology more significantly. (*Id.* pp.12–14.)

On the issue of interference, the amended complaint alleges that Cranford Defendants, primarily through a guidance counselor, held confidential conversations with Costello's child about their gender identity. (Am. Compl. p.9.) These conversations entailed affirmation of child's new gender identity and praising them for being courageous. (*Id.*) This "facilitation and encouragement" resulted in the child's mental-health decline and worsening of existing mental-health conditions. (*Id.* pp.4, 5, 9, 32.)

Of note, the alleged confidentiality applies to school officials. (*See id.* p.3 ("The policies stipulate that *schools* shall keep confidential, and may not disclose, information that may reveal a student's transgender status except as allowed by law.") (emphasis added).) Though Costello contends that the fact

that her child was free to communicate with her "misses the point," without some allegation absent in the amended complaint that her child was affirmatively approached by school officials or prevented or discouraged from contacting her, her child's ability to communicate with her about their gender identity is very much the point under *Anspach*.   *See* 503 F.3d at 267 (noting that the complaint did not allege that the healthcare center's personnel instructed the minor not to contact her parents, the minor expressed reluctance to take the pills without parental advisement and was prevented from doing so, or her parents were mentioned at all).

As for Anspach's applicability to gender-identity issues, at least two district courts within this Circuit have applied *Anspach* to similar circumstances as the case at bar.   *See Landerer v. Dover Area Sch. Dist.*, Case No. 24–00566, 2025 WL 492002, at *7–8 (M.D. Pa. Feb. 13, 2025); *Doe*, 2024 WL 5006711, at *12–14.   Unsurprisingly given the delicate legal and factual contentions implicated, these courts ultimately arrived at disparate conclusions.

The student in *Doe* suffered from childhood trauma, Attention Deficit/Hyperactivity Disorder (ADHD), high-functioning autism, and anxiety. 2024 WL 5006711, at *1.   During their freshman year, the student expressed to a school counselor that they wanted to socially transition.   *Id.* The counselor affirmed the student's identity, asked whether the student wanted to use a new name and pronouns—to which the student answered in the affirmative, and learned that the student did not want their father to be notified.   *Id.*   The school policy, like the Cranford policy, stated that the district was to accept a student's asserted gender identity without parental consent or diagnosis required and that conversations between school officials and the student were to remain confidential.   *See id.* at *2. Staff were instructed to use the student's given name during school announcements to

conceal their new identity from their sibling. *Id.* After discovering the student's social transition, their father met with the counselor and school administration and denied consent to the continued social transition and later sent a cease-and-desist letter. *Id.* at *3. School officials maintained that they would continue to refer to the student by their preferred name and pronoun. *Id.* The plaintiff's second motion for a preliminary injunction was supported by testimony from the student's primary-care provider that confirmed that the student had not been diagnosed with gender dysphoria or determined to be too young to socially transition. *Id.* A declaration from the student's pastoral counselor also stated that they began exhibiting confusion, lack of motivation, situational depression, and isolation coinciding with their social transition. *Id.* at *4.

The plaintiff's substantive due process claim was premised on his right to direct the upbringing of his child. *Id.* at *11. The record, however, indicated that the student initiated the request to socially transition without coercion by the defendants or effort by the defendants to prevent or discourage the student from discussing that request with the plaintiff. *Id.* at *14. Rather, the defendants merely acted on the student's affirmative request. *Id.* The court determined that a finding that a parent's due process rights are infringed by a policy directing the school district to respect the preferred name and pronouns of a student would expand the scope of parental rights beyond the borders set out by the Supreme Court. *Id.* at *12.

The court further concluded that the plaintiff did not meet his burden to show that the defendants and applicable policy interfered with his right to make medical decisions for his child. *Id.* at *15–16. The student was not diagnosed with gender dysphoria or a need to be removed from school to avoid the purported harm of being referred to by their masculine name or pronouns. *Id.* The plaintiff did not demonstrate a likelihood of success on the merits without

evidence that the student suffered or was diagnosed with a mental health condition related to gender identity or "evidence that the school actively encouraged [the student] to socially transition as opposed to 'passively recognizing' [their] wishes." *Id.* at *16. Absent the infringement of a fundamental right, the court applied rational-basis review. *Id.*

The court in *Landerer* arrived at the opposite conclusion. *See* 2025 WL 492002, at *11–12. The student there suffered from post-traumatic stress disorder, ADHD, and anxiety. *Id.* at *1. While in eighth grade, the student informed teachers that they wanted to be treated as a boy and be referred to as "Caleb." *Id.* The district's policy at the time prohibited parental notification absent student consent and a support teacher met with the student regularly throughout the school year to affirm and facilitate the student's request to be treated as a boy. *Id.* at *1–2. The plaintiff asserted Section 1983 claims premised on her substantive due process right to direct the upbringing of her child and direct their medical and mental-health decisions. *Id.* at *3.

After synthesizing *Anspach* and other cases inside and outside of the Third Circuit, the court determined that the amended complaint alleged coercion and interference upon allegations that the support teacher met regularly with the student and that the student felt pressured to continue using their masculine name and be identified as a boy. *Id.* at *10. The school principal also allegedly referred to the student by their given name in front of their mother and by "Caleb" in all other situations, exhibiting some level of manipulation and deceit. *Id.* These actions were not allegedly mandated by the policy, but rather were independently taken by the individual defendants. *Id.*

The court further denied dismissal of the plaintiff's claim related to medical care upon the allegation that the support teacher actively counseled the student. *Id.* at *12. Without a set framework to employ, the court "heed[ed] the Third Circuit's advice in *Gruenke*, that '[s]chool-sponsored

counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution.'" *Id.* (second alteration in original) (quoting *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000)).

Upon careful review of both decisions and additional persuasive authorities, I find that *Doe* most persuasively applies the principles of *Anspach* to the facts of this case. Unlike *Landerer*, the amended complaint does not allege that Cranford Defendants referred to Costello's child by different names in order to deceive her or actively counseled her child. Rather, the amended complaint alleges that a guidance counselor met with Costello's child and affirmed and facilitated their new gender identity, leading to alleged mental-health decline and exacerbation of preexisting conditions. (Am. Compl. pp. 4, 5, 9.) Though Costello alleges that affirmation of her child's gender identity "plunged her child into gender dysphoria," (*id.* p. 9), there is no allegation that the child has been diagnosed with gender dysphoria or any similar condition, *see Doe*, 2024 WL 5006711, at *15 (noting that the student had not been diagnosed with gender confusion or dysphoria).

The amended complaint therefore fails to allege any violative coercion or compulsion on the part of Cranford Defendants. Rather, Cranford Defendants appear to have merely respected the wishes of Costello's child to recognize their stated identity. To find a violation of Costello's parental rights in these actions would be to stretch substantive due process beyond that which is protected by the Constitution. *See Anspach*, 503 F.3d at 262; *Doe*, 2024 WL 5006711, at *12, 15–16; *see also Holland*, 895 F.3d at 293 ("Both the Supreme Court and our Court have repeatedly warned that we cannot read these phrases too broadly to expand the concept of substantive due process, as 'guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.'"

(quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992))).  Such a result is further consonant with growing persuasive authority outside this Circuit.  *See, e.g.*, *Littlejohn v. Sch. Bd. of Leon Cnty.*, Case No. 23–10385, 2025 WL 785143, at *10 (11th Cir. Mar. 12, 2025) (concluding that the defendants' executive actions did not shock the conscience because they did not force the student to attend a student-support-plan meeting, decline to invite their parents, or socially transition at school, but rather sought to help as opposed to harm the student); *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 350, 355 (1st Cir. 2025) (rejecting the contention that use of gender-affirming pronouns or names constituted medical treatment and finding that a protocol preventing teachers from disclosing gender-identity information without student consent did not prevent parents from obtaining information outside of school); *Regino v. Staley*, Case No. 23–00032, 2023 WL 4464845, at *3–4 (E.D. Cal. July 11, 2023) (rejecting the plaintiff's facial and as-applied due-process challenges, concluding that the plaintiff sought an expansion of due-process rights unsupported by precedent, and noting that none of the authorities cited by the plaintiff placed an affirmative duty on the state to inform parents of their child's gender identity or seek parental consent before referring to a child by their preferred name and pronouns); *Vesely v. Ill. Sch. Dist. 45*, 669 F. Supp. 3d 706, 713–14 (N.D. Ill. 2023) (finding that the plaintiff failed to plausibly allege that the school district's social-transition policy interfered with a fundamental parental right and applying rational-basis review).

I am unpersuaded by Costello's citation to a recent Western District of Pennsylvania decision for the proposition that when parental authority and school authority collide, "'the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest'—which here, no such interest exists to obstruct parental involvement in an immanently medical matter." (Costello Opp'n Br. pp.13, 14.) The

school district in *Tatel v. Mt. Lebanon School District* allegedly had a policy and practice of providing parental notification and opt-out before presenting sensitive, complex, or controversial topics to students.   637 F. Supp. 3d 295, 303–04 (W.D. Pa. 2022), *clarified by*, 675 F. Supp. 3d 551 (W.D. Pa. 2023).   The relevant first-grade curriculum did not include teaching about gender dysphoria or transitioning and parents were assured by the school principal that such topics would not be taught.   *Id.* at 304.   Nonetheless, a teacher was permitted to teach about gender dysphoria and transitioning throughout the year, including having private conversations with one child about how the child reminded her of her transgender child, doctors may be mistaken about gender, she would not lie to him, and he should not tell his parents about their conversations.   *Id.* at 304–05.   The teacher received permission to show two videos to her class allegedly about gender dysphoria without parental notice. *Id.* at 305.   The teacher refused to refrain from such instruction during a meeting with a parent and the principal defended the decisions before later conceding that parents should have been notified.   *Id.* at 306.

The court concluded that introducing a child to complex and sensitive subjects, before a parent would have, may undermine parental authority and that a teacher instructing first-graders that the teacher's beliefs are correct while their parents' may be incorrect "directly repudiates parental authority." *Id.* at 321.   That is not Costello's case.   The amended complaint does not allege that Cranford Defendants affirmatively introduced her child to transgender topics or social transitioning or that they instructed her child that Costello's beliefs were incorrect or to conceal conversations from her.   Rather, she alleges reactive measures including affirming her child's "self-diagnos[ed]" new identity. (Am. Compl. p.9.) Because Costello has not pleaded infringement of a fundamental right, rational-basis review applies.   *See Doe*, 2024 WL 5006711, at *16.

The relevant question is whether a legitimate state interest can rationally be served by the Cranford policy.  *See Holland*, 895 F.3d at 293.  I concluded that it can.

Cranford Defendants assert that the policy was implemented to support a safe, nondiscriminatory environment for transgender students and that that interest meets the heightened strict-scrutiny standard.  (ECF No. 76 p. 35.) The Third Circuit has already concluded in the analogous context of restroom and locker-room policies that school districts have "a compelling state interest in protecting transgender students from discrimination."  *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018).  I find that this compelling interest thus also satisfies the lower legitimate-interest standard. *See Doe*, 2024 WL 5006711, at *16 (applying the Third Circuit's discussion in *Doe* to its rational-basis review); *see also Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 174 (3d Cir. 2008) (deciding that if compliance with the Establishment Clause could serve a compelling state interest, it could also serve a legitimate educational interest).  I am further satisfied that this legitimate interest may rationally be served by Cranford's policy of affirmation and confidentiality.  *See Foote*, 128 F.4th at 357 (concluding that the protocol requiring staff to use students' requested names and pronouns without parental notification "plausibly creates a space for students to express their identity without worrying about parental backlash.  By cultivating an environment where students may feel safe in expressing their gender identity, the Protocol endeavors to remove psychological barriers for transgender students and equalizes educational opportunities").

In sum, Costello has not pleaded infringement of a fundamental right. Because the Cranford policy rationally serves Cranford Defendants' legitimate interest in fostering a safe, nondiscriminatory environment for transgender

students, Costello's claims will be dismissed to the extent that she seeks monetary damages.

## V.     CONCLUSION

For the foregoing reasons, Cherry Hill and Cranford Defendants' motions (ECF Nos. 76, 78, 79) will be GRANTED. The amended complaint and intervenor complaint will be dismissed without prejudice. An appropriate order accompanies this opinion.

    /s/ Edward S. Kiel
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated:  March 28, 2025